05-6942-cv
City of New York v. Beretta

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2007

(Argued:  September 21, 2007                    Decided: April 30, 2008)

Docket No. 05-6942-cv(LEAD), 05-6964-cv (XAP), 06-3692-cv (CON), 06-3695-cv (XAP)

_____

CITY OF NEW YORK,

                    Plaintiff-Appellee-Cross-Appellant,

MICHAEL R. BLOOMBERG,[*] Mayor of the City of New York, CHRISTINE C. QUINN,[**]
Speaker of the New York City Council, NEW YORK CITY HEALTH AND HOSPITALS
CORPORATION,

                    Plaintiffs-Appellees,

UNITED STATES OF AMERICA,

                    Intervenor,

                    v.

BERETTA U.S.A. CORP., BROWNING ARMS CO., COLT'S MFG. CO., INC., FORJAS
TAURUS, S.A., GLOCK INC., PHOENIX ARMS, SIGARMS, INC., SMITH & WESSON
CORP., STURM, RUGER AND CO., INC., TAURUS INTERNATIONAL
MANUFACTURING, INC., SIGARMS SAUER GMBH, f/k/a J.P. Sauer & Sohn Inc.,
TANFOLGIO FRATELLI S.R.L., WILLIAMS SHOOTERS SUPPLY, WALTER CRAIG,
INC., VALOR CORP., SPORTS SOUTH, INC., SOUTHERN OHIO GUN, INC., RSR
GROUP, INC., RON SHIRK'S SHOOTERS' SUPPLIES, INC., RILEY'S INC., MKS
SUPPLY, INC., LIPSEY'S, INC., LEW HORTON DISTRIBUTION CO., KIESLER POLICE

_____

[*]  Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Michael R. Bloomberg,
Mayor of the City of New York, is automatically substituted for former Mayor Rudolph W.
Guiliani as a plaintiff-appellee.

[**]  Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Speaker of the New York
City Council Christine C. Quinn is automatically substituted for former Speaker Peter F. Vallone
as a plaintiff-appellee.

SUPPLY INC., HICKS, INC., GLEN ZANDERS FUR AND SPORTING GOODS, CO., FABER BROTHERS, INC., EUCLID AVENUE SALES, ELLETT BROTHERS, INC., DIXIE SHOOTERS SUPPLY, INC., DAVIDSON'S SUPPLY COMPANY, INC., CHATTANOOGA SHOOTING SUPPLIES, INC., CAMFOUR, INC., BRAZAS SPORTING ARMS, INC., BILL HICKS & COMPANY, BANGERS, L.P., ALAMO LEATHER GOODS, INC., ACUSPORT CORPORATION,

Defendants-Appellants-Cross-Appellees,

B.L. JENNINGS, INC., BRYCO ARMS, INC., CARL WALTHER GMBH, FMJ, a/k/a Full Metal Jacket, GLOCK GMBH, H&R 1871, INC., HI-POINT FIREARMS, NAVEGAR INC., d/b/a Intratec USA, Inc., O.F. MOSSBERG AND SONS, INC., PIETRO BERETTA SP.A, ROSSI, S.A., JOHN DOE MANUFACTURERS 1-100, CHINA NORTH INDUSTRIES CORPORATION, a/k/a Norinco, REMINGTON ARMS CO. INC., CHARCO 2000, INC., LLAMA GABILONDO Y CIA, MARLIN FIREARMS CO., SAVAGE ARMS, INC., U.S. REPEATING ARMS CO., INC., SCOTT WHOLESALE CO., INC., Manufacturer Defendants, Distributor Defendants, Manufacturer and Distributor Defendants,

Defendants,

Joan Truman Smith,

Interested-Party,

John F. Curran,

Interested Party.
_____
Before: MINER, CABRANES, and KATZMANN, Circuit Judges.

Appeal from so much of an order entered in the United States District Court for the Eastern District of New York (Weinstein, J.) as denies the motion by defendant firearms suppliers, grounded on the claim restriction provisions of the Protection of Lawful Commerce in Arms Act, to dismiss the complaint of plaintiff City of New York seeking injunctive relief to inhibit the diversion of firearms into illegal markets, the District Court having determined that the Act's statutory exception allowing claims for violation of a state statute is met by the New York criminal nuisance statute; cross appeal from so much of the same order as rejects, in accordance with the position taken by intervenor United States of America, various constitutional challenges to the Act.

The judgment of the District Court is affirmed with respect to the constitutionality of the PLCAA and reversed as to the denial of the Firearms Suppliers' motion to dismiss on the basis of the claim restricting provisions of the PLCAA.

Judge Katzmann dissents in a separate opinion.

MICHAEL L. RICE, Thomas E. Fennell, Jones Day, Dallas, TX, for Defendant-Appellant-Cross-Appellee Colt's Manufacturing Company LLC.

Lawrence S. Greenwald, Lawrence P. Fletcher-Hill, Catherine A. Bledsoe, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC, Baltimore, MD, for Defendant-Appellant-Cross-Appellee Beretta U.S.A. Corp.

Clem C. Trischler, Robert R. Leight, Pietragallo, Bosick & Gordon, Pittsburgh, PA, for Defendant-Appellant-Cross-Appellee Smith & Wesson Corp.

Joanne M. McLaren, Greenberg Traurig, LLP, New York, NY, for Defendant-Appellant-Cross-Appellee Smith & Wesson Corp.

James P. Dorr, James B. Vogts, Aimee B. Anderson, Sarah L. Olson, Wildman, Harrold, Allen & Dixon, Chicago, IL, for Defendant-Appellant-Cross-Appellee Sturm, Ruger & Co., Inc.

John F. Renzulli, Christopher Renzulli, Scott C. Allan, Renzulli Law Firm, LLP, New York, NY, for Defendant-Appellants-Cross-Appellees Glock, Inc. and Browning Arms Co.

Timothy A. Bumann, J. Clayton Cheshire, Budd Larner, P.C., Atlanta, GA, Kathleen Marchetti, Budd Larner, P.C., Short Hills, NJ, for Defendants-Appellants-Cross-Appellees Taurus International Manufacturing, Inc. and Forjas Taurus, S.A.

Christopher M. Chiafullo, Whitney R. Chelnik, The Chiafullo Group, LLP, Watchung, NJ, for Defendants-Appellants-Cross-Appellees AcuSport Corporation; Alamo Leather Goods, Inc.; Bill Hicks and Company, Inc.; Brazas Sporting Arms, Inc.; Camfour, Inc.; Chattanooga Shooting Supplies, Inc.; Davidson's Supply Company, Inc.; Dixie Shooters Supply, Inc.; Ellett Brothers, Inc.; Euclid Avenue Sales Co.; Faber Brothers, Inc.; Glen Zanders Fur and Sporting Goods Co.; Hicks, Inc.; Kiesler Police Supply, Inc.; Lew Horton Distributing Company,

3

Inc.; Lipsey's, Inc.; MKS Supply, Inc.; Riley's, Inc.; Ron Shirk's Shooters Supply, Inc.; RSR Group, Inc.; Southern Ohio Gun, Inc.; Sports South, Inc.; Valor Corporation; Walter Craig, Inc.; and Williams Shooters Supply.

Scott L. Braum, Timothy Rudd, Scott L. Braum & Assoc., Ltd., Dayton, OH, for Defendants-Appellants-Cross-Appellees MKS Supply, Inc.; Euclid Avenue Sales Co., and Walter Craig, Inc.

Richard J. Leamy, Jr., Wiedner & McAuliffe, Ltd., Chicago, IL, for Defendants-Appellants-Cross-Appellees Faber Brothers, Inc. and Riley's Inc.

William M. Griffin, Jonann Coniglio Chiles, Karen S. Halbert, Jamie Huffman Jones, Friday, Eldredge & Clark, Little Rock, AR, for Defendant-Appellant-Cross-Appellee Browning Arms Co.

Robert L. Joyce, Wilson, Esler, Moskowitz, Edelman & Dicker LLP, New York, NY, for Defendants-Appellants-Cross-Appellees Sigarms, Inc. and Sig Sauer GmbH.

John J. McCarthy, III, The McCarthy Law Firm, PLLC, New York, NY, for Defendant-Appellant-Cross-Appellee Tanfoglio Fratellis S.R.L.

Michael I. Branisa, Michael J. Zomcik, Branisa & Zomcik, P.C., Houston, TX, for Defendant-Appellant-Cross-Appellee Phoenix Arms.

Andrew Zajac, Fiedelman & McGaw, Jericho, NY, for Defendants-Appellants-Cross-Appellees AcuSport Corporation; Alamo Leather Goods, Inc.; Bill Hicks and Company, Inc.; Brazas Sporting Arms, Inc.; Camfour, Inc.; Chattanooga Shooting Supplies, Inc.; Davidson's Supply Company, Inc.; Dixie Shooters Supply, Inc.; Ellett Brothers, Inc.; Euclid Avenue Sales Co.; Faber Brothers, Inc.; Glen Zanders Fur and Sporting Goods Co.; Hicks, Inc.; Kiesler Police Supply, Inc.; Lew Horton Distributing Company, Inc.; Lipsey's, Inc.; MKS

4

Supply, Inc.; Riley's, Inc.; Ron Shirk's Shooters Supply, Inc.; RSR Group, Inc.; Southern Ohio Gun, Inc.; Sports South, Inc.; Valor Corporation; Walter Craig, Inc.; and Williams Shooters Supply.

MICHAEL A. CARDOZO, Corporation Counsel of the City of New York (Leonard Koerner, Grace Goodman, Eric Proshansky, June Buch, Gail Rubin, Richard J. Costa, Melanie C.T. Ash, of counsel), New York, NY, for Plaintiff-Appellee-Cross-Appellant, the City of New York.

Michael S. Elkin, Thomas P. Lane, Thelen, Reid & Priest LLP, New York, NY, for Plaintiff-Appellee-Cross-Appellant, the City of New York.

Dennis A. Henigan, Jonathan E. Lowy, Brian J. Siebel, Elizabeth S. Haile, Daniel Vice, Brady Center to Prevent Gun Violence, Washington, DC, for Plaintiff-Appellee-Cross-Appellant, the City of New York.

Robert S. Peck, Center for Constitutional Litigation, Washington, DC, for Plaintiff-Appellee-Cross-Appellant, the City of New York.

Paul R.Q. Wolfson, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, for Plaintiff-Appellee-Cross-Appellant, the City of New York.

ELLIOT M. SCHACHNER, for Benton J. Campbell, United States Attorney for the Eastern District of New York, (Varuni Nelson, Assistant United States Attorney, of counsel ), Brooklyn, NY, for Intervenor, the United States of America.

Beth S. Brinkman, Seth M. Galanter (Brian R. Matsui, on the brief), Morrison & Foerster LLP, Washington, DC, for Amici Curiae Legal Community Against Violence, Educational Fund to Stop Gun Violence, and The Violence Policy Center.

Stephen D. Poss, P.C., Kevin P. Martin, Randall B.

5

Clark, Nicholas D. Gray, Christina E. Nolan, Michael P. Sugrue, Michael C. Winfield, Goodwin Proctor LLP, Boston, MA, for Amicus Curiae NRA Civil Rights Defense Fund.

Andrew Cuomo, Attorney General of the State of New York (Caitlin J. Halligan, Solicitor General, Daniel Smirlock, Deputy Solicitor General, Jennifer Grace Miller, Assistant Solicitor General, of counsel), Albany, NY, for Amicus Curiae New York State Attorney General.

MINER, Circuit Judge:

Defendants-appellants-cross-appellees, manufacturers and wholesale sellers of firearms ("Firearms Suppliers"), appeal from so much of an order entered in the United States District Court for the Eastern District of New York (Weinstein, J.) as denies their motion, grounded on the claim restriction provisions of the Protection of Lawful Commerce in Arms Act, for dismissal of the complaint. In the complaint, plaintiff-appellee-cross-appellant, the City of New York (the "City"), seeks injunctive relief to inhibit the diversion of firearms into illegal markets. The District Court determined that the Act did not violate the United States Constitution, and that the Act's statutory exception for claims based on the violation of a state statute applicable to the sale or marketing of firearms is met by New York's criminal nuisance statute. The City cross appeals from so much of the above-described order as rejects, in accordance with the position taken by intervenor United States of America, various constitutional challenges to the Act raised by the City. Because we conclude that the PLCAA (1) bars the instant action and (2) represents a permissible exercise of Congress's power under the Commerce Clause, we affirm the order of the District Court in part and reverse in part.

## BACKGROUND

I.    Introduction

The action giving rise to this appeal was commenced on June 20, 2000, when the City filed a complaint against the Firearms Suppliers seeking injunctive relief and abatement of the alleged public nuisance caused by the Firearms Suppliers' distribution practices. The City claimed that the Firearms Suppliers market guns to legitimate buyers with the knowledge that those guns will be diverted through various mechanisms into illegal markets. The City also claimed that the Firearms Suppliers fail to take reasonable steps to inhibit the flow of firearms

into illegal markets. On October 2, 2001, the action was stayed due to issues arising from the September 11, 2001 attacks on the World Trade Center. The initial stay of sixty days was continued pending the outcome of an appeal proceeding in state court involving the same claims for relief sought by the State of New York against most of the defendants in this action. See Spitzer v. Sturm, Ruger & Co., Inc., 761 N.Y.S.2d 192, 194–95 (N.Y. App. Div.), leave to appeal denied, 769 N.Y.S.2d 200 (2003) (affirming dismissal of the state's common law public nuisance claim). After the stay was lifted, the City filed a Second Amended Complaint ("Amended Complaint") on January 27, 2004.

On October 26, 2005, the Protection of Lawful Commerce in Arms Act, Pub. L. No. 109-92, 119 Stat. 2095 (codified at 15 U.S.C. §§ 7901–03) (the "PLCAA" or the "Act") became federal law. The PLCAA provides that any "qualified civil liability action that is pending on October 26, 2005, shall be immediately dismissed by the court in which the action was brought or is currently pending." 15 U.S.C. § 7902(b). A "qualified civil liability action" is

> a civil action or proceeding . . . brought by any person against a manufacturer or seller of a [firearm distributed in interstate or foreign commerce] . . . for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a [firearm distributed in interstate or foreign commerce] by the person or a third party.

15 U.S.C. § 7903(5)(A). On the day the PLCAA was enacted, the Firearms Suppliers moved to dismiss the Amended Complaint pursuant to section 7902(b). In its opposition to the Firearms Suppliers' motion to dismiss, the City argued that the Act did not bar its causes of action because this case fell within an exception to the forbidden qualified civil liability actions. Pursuant to an exception written into the Act, a suit may proceed when a plaintiff adequately alleges that a "manufacturer or seller of [firearms transported in interstate or foreign commerce] knowingly

8

violated a State or Federal statute applicable to the sale or marketing of [firearms], and the violation was the proximate cause of the harm for which relief is sought." 15 U.S.C. § 7903(5)(A)(iii). This provision has been called the "predicate exception," which appellation we adopt. For purposes of this opinion, a statute upon which a case is brought under the predicate exception is referred to as a "predicate statute." The predicate statute at issue in this case is New York Penal Law § 240.45, Criminal Nuisance in the Second Degree.[1] The Firearms Suppliers claimed that New York Penal Law § 240.45 may not serve as a predicate statute because the predicate exception is meant to apply to statutes that are expressly and specifically applicable to the sale and marketing of firearms, and not to statutes of general applicability, such as section 240.45. The City also challenged the constitutionality of the Act on various grounds. The United States intervened to defend the constitutionality of the PLCAA, taking no position on the PLCAA's effect, if any, on the litigation.

On December 2, 2005, the United States District Court for the Eastern District of New York (Weinstein, J.) denied the Firearms Suppliers' motion to dismiss, finding that the claim restriction provisions of the PLCAA did not require dismissal of the case at bar. City of New York v. Beretta U.S.A. Corp., 401 F. Supp. 2d 244 (E.D.N.Y. 2005). The District Court held that, "[b]y its plain meaning, New York [Penal Law §] 240.45 satisfies the language of the predicate exception requiring a 'statute applicable to the sale or marketing of [a firearm].'" Id. at

---

[1] N.Y. Penal Law § 240.45 provides, in pertinent part:

A person is guilty of criminal nuisance in the second degree when. . .

By conduct either unlawful in itself or unreasonable under all the circumstances, he knowingly or recklessly creates or maintains a condition which endangers the safety or health of a considerable number of persons . . . .

9

261.  The District Court also found that if the Act did operate to bar the City's claims, it would be constitutional.  Id. at 251.

The District Court certified its December 2, 2005 order for immediate appeal to this Court, pursuant to 28 U.S.C. § 1292(b).  Id. at 298 ("There is a substantial ground for disagreement about a controlling issue of law — the applicability of the Act to the present litigation — and an immediate appeal may substantially advance the ultimate termination of the litigation.").  The Firearms Suppliers appeal from the District Court's denial of their motion to dismiss, and the City cross appeals from the District Court's holding that the PLCAA is constitutional.

For the reasons that follow, we conclude that the City's claim, predicated on New York Penal Law § 240.45, does not fall within an exception to the claim restricting provisions of the Act because that statute does not fall within the contours of the Act's predicate exception.  We also hold that the PLCAA is a valid exercise of the powers granted to Congress pursuant to the Commerce Clause and that the PLCAA does not violate the doctrine of separation of powers or otherwise offend the Constitution in any manner alleged by the City.

II.     The City's Allegations

The factual bases for the City's complaint are set forth in painstaking detail in NAACP v. Acusport, 271 F. Supp. 2d 435 (E.D.N.Y. 2003), and City of New York v. Beretta U.S.A. Corp., 315 F. Supp. 2d 256 (E.D.N.Y. 2004) (denying motion to dismiss).  Accordingly, our factual summary is brief.  The City seeks "injunctive relief and abatement of the public nuisance that defendants cause, contribute to and maintain by their marketing and distribution practices." Amended Complaint ¶ 1.  The City alleges that the Firearms Suppliers know that firearms distributed to legitimate retailers are diverted into illegal markets and that the Firearms Suppliers

"could, but do not, monitor, supervise or regulate the sale and distribution of their guns by their downstream distributors or dealer-customers"; "could, but do not, monitor, supervise or train distributors or dealers to avoid sales that feed the illegal secondary market"; and "make no effort to determine those distributors and dealers whose sales disproportionately supply the illegal secondary market." Amended Complaint ¶ 8. In spite of New York City's strict controls on gun possession,

> thousands of guns manufactured or distributed by defendants were used to commit crimes in the City of New York. This number includes only guns that were recovered in the course of a crime. The actual number of defendants' 'crime guns' used in New York City over the last five years is vastly higher.

Amended Complaint ¶ 62.

According to the City, among the mechanisms that serve to facilitate the movement of legally distributed handguns into illegal markets are: (i) gun shows, at which non-licensed persons can sell to other private citizens; (ii) private sales from "non-stocking" or "kitchen table" sellers, who are not required to conduct background checks or to maintain records that Federal Firearms Licensees ("FFL") are required to maintain; (iii) "straw purchases," in which persons qualified to purchase handguns make purchases on behalf of those who are not so qualified; (iv) "multiple sales," in which a purchaser buys more than one gun at the same time or during a limited period of time for the purpose of transferring the guns to unqualified purchasers; (v) intentional illegal trafficking by corrupt FFLs; (vi) thefts from FFLs with poor security, as well as false reports of theft by corrupt FFLs; and (v) oversupplying of markets where gun regulations are lax. The City seeks injunctive relief requiring the Firearms Suppliers to take assorted measures that would effectively inhibit the flow of firearms into illegal markets.

**DISCUSSION**

11

## I. Jurisdiction

Pursuant to 28 U.S.C. § 1292(b), this Court has the discretionary authority to entertain an appeal of a non-final order of a district court "[w]hen a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). A district judge must express such an opinion in writing in the otherwise non-appealable order. Id. Here, in its December 2, 2005 Memorandum and Order, the District Court wrote, in relevant part: "There is a substantial ground for disagreement about a controlling issue of law — the applicability of the [PLCAA] to the present litigation — and an immediate appeal may substantially advance the ultimate termination of the litigation." Beretta, 401 F. Supp. 2d at 298.

We have jurisdiction pursuant to 28 U.S.C. § 1292(b) to review the constitutional questions decided by the District Court in addition to the issue of the PLCAA as a bar to the litigation. When a district court certifies, pursuant to 28 U.S.C. § 1292(b), a question of controlling law, the entire order is certified and we may assume jurisdiction over the entire order, not merely over the question as framed by the district court. See United States v. Stanley, 483 U.S. 669, 676–77 (1987) (explaining that 28 U.S.C. § 1292(b) "brings the 'order,' not the question, before the [appellate] court"). The order here determined that the PLCAA does not apply to this litigation and that, if it did apply, it would be constitutional. This Court exercised its discretionary authority and granted permission to appeal. We therefore review the issue of the constitutionality of the PLCAA as well as the issue of the PLCAA as a bar to the litigation.

12

## II.     Standard of Review

The Firearms Suppliers styled their October 26, 2005 motion before the District Court as a "Motion to Dismiss, or in the Alternative, for Judgement on the Pleadings." Both the denial of a motion to dismiss, see Fed. R. Civ. P. 12(b)(6), and the denial of a motion for judgment on the pleadings, see Fed. R. Civ. P. 12(c), are reviewed de novo. See Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 300 (2d Cir. 2003); see also DeMuria v. Hawkes, 328 F.3d 704, 706 n.1 (2d Cir. 2003) (noting that the legal standards of review for motions to dismiss and motions for judgment on the pleadings "are indistinguishable"). "On a motion to dismiss or for judgment on the pleadings we 'must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor.'" Miller, 321 F.3d at 300 (quoting Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001)). We review questions of the interpretation and constitutionality of a federal statute de novo. See, e.g., Muller v. Costello, 187 F.3d 298, 307 (2d Cir. 1999).

## III.     Constitutionality of the PLCAA[2]

---

[2] Our dissenting colleague contends that the constitutionality of the PLCAA is "beside the point," Dissent at ___, suggesting that our "practice of constitutional avoidance" represents a factor weighing in favor of certification. We are puzzled by this view for several reasons.

First, the rules of certification promulgated by both our Court and the New York Court of Appeals make clear that, even if we accepted our colleague's suggestion to certify the predicate exception issue to the New York Court of Appeals, it would be necessary first to pass on the constitutional issues. Our local rules require that we certify only state law questions "that will control the outcome of a case." 2d Cir. Rule § 0.27. New York's certification statute does the same. See 22 N.Y. Comp. Codes R. & Regs. tit. 22, § 500.27 ("Whenever it appears to the Supreme Court of the United States, any United States Court of Appeals, or a court of last resort of any other state that determinitive questions of New York law are involved in a case pending before that court for which no controlling precedent of the Court of Appeals exists, the court may certify the dispositive questions of law to the Court of Appeals." (emphases added)).

Second, there is the fact that this case itself requires us to confront questions as to the

The City advances four arguments on cross-appeal with respect to the constitutionality of the PLCAA: (i) the PLCAA is not a permissible exercise of Congress's power to regulate interstate commerce; (ii) the PLCAA violates basic principles of separation of powers by dictating the outcome of pending cases; (iii) the PLCAA, by recognizing predicate exceptions defined by statute, i.e. by a state's legislative branch, but not by common law as interpreted by state courts, violates the Tenth Amendment by dictating which branch of states' governments may authoritatively pronounce state law; and (iv) the PLCAA violates the First Amendment's guarantee of the right to petition the government to redress grievances through access to the courts. For the reasons that follow, we agree with the District Court that "[t]here is no violation of the United States Constitution," Beretta, 401 F. Supp. 2d at 272.

A.      Commerce Clause Regulatory Power

The United States Constitution vests Congress with the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its authority to "regulate Commerce with foreign Nations, and among the several States." U.S. Const. Art. I, § 8. Cases decided by the Supreme Court pertaining to Congress's authority to regulate interstate commerce have identified three general categories of regulation in which Congress is authorized to engage pursuant to the Commerce Clause. See Gonzales v. Raich, 545 U.S. 1, 16 (2005). First, Congress may regulate the channels of interstate commerce. Id. (citing Perez v. United States, 402 U.S. 146, 150 (1971)). Second, Congress has authority to regulate and protect the instrumentalities of interstate commerce and persons or things in interstate commerce. Id.

PLCAA's constitutionality. The City presented its constitutional arguments as an alternative grounds for relief, and the District Court specifically ruled on these arguments.

14

"Finally, Congress'[s] commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce."  United States v. Lopez, 514 U.S. 549, 558–59 (1995) (internal citations omitted); see also NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 37 (1937) ("Although activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions, Congress cannot be denied the power to exercise that control.").  It is the third category with which we are here concerned.

The City claims that the activity that the PLCAA concerns itself with — civil litigation against members of the gun industry for unlawful acts committed by third parties — is not commercial in nature and therefore is outside of Congress's regulatory power.  In support of its argument that Congress has exceeded its power by regulating litigation, the City relies on Lopez and United States v. Morrison, 529 U.S. 598 (2000), both of which involved statutes found to bear only a tenuous relationship with interstate commerce.  See Morrison, 529 U.S. at 612 (following Lopez and explaining that the "decision in Lopez rested in part on the fact that the link between gun possession [in a school zone] and a substantial effect on interstate commerce was attenuated").  Lopez involved the Gun-Free School Zones Act of 1990, 18 U.S.C. § 922(q)(1)(A) (1988 & Supp. V), which the Court described as "a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms."  514 U.S. at 561.  In Lopez, the government argued that the possession of guns in school zones would affect interstate commerce because: (i) the costs of violent crime that might be caused by guns in school zones will be spread throughout the

15

population through increased insurance costs; (ii) increases in violent crime caused by guns in school zones would deter interstate travel to areas that are perceived to be unsafe; and (iii) "the presence of guns in schools poses a substantial threat to the educational process by threatening the learning environment.  A handicapped educational process, in turn, will result in a less productive citizenry.  That, in turn, would have an adverse effect on the Nation's economic well-being."  Id. at 563–64.

The Lopez Court rejected these arguments, reasoning that if Congress could permissibly regulate activities with such ethereal ties to interstate commerce, no logical limit could be imposed upon federal power.  The Court further held:  "The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce.  Respondent was a local student at a local school; there is no indication that he had recently moved in interstate commerce, and there is no requirement that his possession of the firearm have any concrete tie to interstate commerce."  Id. at 567.

Morrison involved the civil remedy provision of the Violence Against Women Act ("VAWA"), 42 U.S.C. § 13981.  In enacting VAWA, Congress found that gender-motivated violence affects interstate commerce "by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved in interstate commerce; . . . by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products."  Morrison, 529 U.S. at 615 (quoting H.R. Conf. Rep. No. 103–711, at 385 (1994), as reprinted in 1994 U.S.C.C.A.N. 1801, 1853).  The government argued, consistent with the Congressional findings, that gender-motivated violence substantially effects interstate commerce, but the

16

Supreme Court rejected this argument, explaining that the government's reasoning "seeks to follow the but-for causal chain from the initial occurrence of violent crime . . . to every attenuated effect upon interstate commerce." Morrison, 529 U.S. at 615.

In the case at bar, we agree with the District Court that "the connection between the regulated activity and interstate commerce under the Act is far more direct than that in Morrison [and Lopez]." Beretta, 401 F. Supp. 2d at 287. When enacting the PLCAA, Congress explicitly found that the third-party suits that the Act bars are a direct threat to the firearms industry, whose interstate character is not questioned. Furthermore, the PLCAA only reaches suits that "have an explicit connection with or effect on interstate commerce." Lopez, 514 U.S. at 562. The claim-preclusion provisions of § 7902 apply to actions "brought . . . against a manufacturer or seller of a qualified product" for relief from injuries "resulting from the criminal or unlawful misuse of a qualified product," 15 U.S.C. § 7903(5)(A); where "qualified product means a firearm . . . or a component part of a firearm or ammunition, that has been shipped or transported in interstate or foreign commerce," id. at § 7903(4) (emphasis added). Accordingly, unlike the Gun-Free School Zones Act and Violence Against Women Act, the PLCAA raises no concerns about Congressional intrusion into "truly local" matters. See Morrison, 529 U.S. at 618; Lopez, 514 U.S. at 567. The City itself, in the Amended Complaint, stressed the interstate character of the firearms industry. A foundation of the City's claim is that New York City's strict limitations on gun possession are undermined by the uncontrolled seepage into New York of guns sold in other states.

We agree that the firearms industry is interstate — indeed, international — in nature. Of course, we acknowledge that "simply because Congress may conclude that a particular activity

17

substantially affects interstate commerce does not necessarily make it so." Lopez, 514 U.S. at 557 n.2 (internal quotation marks omitted). We also should not and do not express any opinion as to the accuracy of the Congressional findings with respect to the Act. Nevertheless, "[d]ue respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." Morrison, 529 U.S. at 607 (citing Lopez, 514 U.S. at 568). There has been no such showing here. We find that Congress has not exceeded its authority in this case, where there can be no question of the interstate character of the industry in question and where Congress rationally perceived a substantial effect on the industry of the litigation that the Act seeks to curtail.

B. Principles of Separation of Powers

The doctrine of separation of powers is "one of the organizing principles of our system of government." Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 469 (1977). "It is . . . essential to the successful working of this system that the persons intrusted with power in any one of [the] branches [of government] shall not be permitted to encroach upon the powers confided to the others." Kilbourn v. Thompson, 103 U.S. 168, 191 (1880). Article III of the Constitution "establishes a 'judicial department' with the 'province and duty . . . to say what the law is' in particular cases and controversies." Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 218 (1995) (quoting Marbury v. Madison, 1 Cranch 137, 177 (1803)). Article III forbids legislatures from "'prescrib[ing] rules of decision to the Judicial Department of the government in cases pending before it.'" Plaut, 514 U.S. at 218 (quoting United States v. Klein, 80 U.S. 128, 147 (1871)); see also Town of Deerfield v. FCC, 992 F.2d 420, 428 (2d Cir. 1993) (explaining that Congress may

18

not "'prescribe a rule for the decision of a cause in a particular way'" (quoting Klein, 80 U.S. at 146)). However, this "prohibition does not take hold when Congress 'amend[s] applicable law.'" Plaut, 514 U.S. at 218 (quoting Robertson v. Seattle Audubon Soc., 503 U.S. 429, 441 (1992)).

Here, the City claims that the Act's mandate of dismissal of pending actions against firearms manufacturers violates Klein by legislatively directing the outcome of specific cases without changing the applicable law. The government, however, argues that Klein does not prohibit Congress from enacting statutes that set forth new rules of law applicable to pending cases, provided the new rule of law is also made applicable prospectively to cases commenced after enactment. We agree with the government that the Act permissibly sets forth a new rule of law that is applicable both to pending actions and to future actions.

The PLCAA bars qualified civil liability actions, as defined in the statute. The definition of qualified civil liability action permissibly sets forth a new legal standard to be applied to all actions. See Miller v. French, 530 U.S. 327, 348–49 (2000) (holding that the section of Prison Litigation Reform Act providing that a motion to terminate operates as an automatic stay of prospective relief did not violate separation of powers because the automatic stay provision "simply imposes the consequences of the court's application of the new legal standard" and does not simply direct decision in a pending case); Robertson, 503 U.S. at 438–39 (holding that an amendment to governing law allowing timber harvesting in old growth forest under certain conditions and providing that compliance with those conditions would satisfy the statutory requirements at issue in two existing cases "compelled changes in law, not findings or results under old law"). Because the PLCAA does not merely direct the outcome of cases, but changes the applicable law, it does not violate the doctrine of separation of powers.

C.     Tenth Amendment and Fundamental Principles of Federalism

The Tenth Amendment to the United States Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The City claims that the PLCAA impermissibly dictates to the states which branch of their government may authoritatively articulate state law — to wit, that the Act prohibits courts from giving effect to the states' exercise of their lawmaking power through the judicial branch. According to the City, the Act recognizes the authority of states' legislatures to create a predicate exception to qualified civil liability actions by enacting a statute expressly applicable to the sale of firearms, whereas if a state court interprets a general statute as applicable to the sale of firearms, such an interpretation would not create a predicate exception under the Act.

According to the City, the Act "impermissibly oversteps [] fundamental limits when it determines which branch of state government will be recognized by the Federal Government as the authoritative expositor of any state's pertinent laws." This argument is apparently in response to the interpretation of the Act advanced by the Firearms Suppliers at oral argument before the District Court. See Beretta, 401 F. Supp. 2d at 264. The Firearms Suppliers argued that a predicate statute must explicitly mention firearms and that a general statute could not serve as a predicate statute even if a state's highest court were to construe that statute as applicable to firearms. Id. We disagree with this argument and, as set forth in more detail below, do not construe the PLCAA as foreclosing the possibility that predicate statutes can exist by virtue of interpretations by state courts. We agree with the District Court in its rejection of the Firearms Suppliers' argument that a statute must expressly mention firearms in order to qualify as a

20

predicate statute. The District Court held that the Firearms Suppliers' argument "misconstrues the relationship of courts and legislatures in New York. The law is not only the language that the legislature adopts, but what the courts construe to be its meaning in individual cases." Id. at 266 (citing N.Y. Const. art. 6, § 1 (unified court system); N.Y. Const. art. 6, § 2 (jurisdiction of Court of Appeals); N.Y. C.P.L.R. § 103 (form of civil judicial proceedings)).

In any event, the critical inquiry with respect to the Tenth Amendment is whether the PLCAA commandeers the states. See Connecticut v. Physicians Health Servs. of Conn., Inc., 287 F.3d 110, 122 (2d Cir. 2002). As the City concedes, the PLCAA does not. We have explained that

> [[f]ederal statutes validly enacted under one of Congress's enumerated powers — here, the Commerce Clause — cannot violate the Tenth Amendment unless they commandeer the states' executive officials, see Printz v. United States, 521 U.S. 898, 933 (1997), or legislative processes, see New York v. United States, 505 U.S. 144, 161–66 (1992); see also Cellular Phone Taskforce v. Fed. Communications Comm'n, 205 F.3d 82, 96 (2d Cir. 2000) (holding that a federal telecommunications law preempting states' ability to regulate the health and safety issues with respect to certain personal wireless service facilities does not violate the Tenth Amendment because the "statute does not commandeer local authorities to administer a federal program"); City of New York v. United States, 179 F.3d 29, 35 (2d Cir. 1999) (holding [in relevant part] that the Tenth Amendment is a "shield against the federal government's using state and local governments to enact and administer federal programs . . . ."); United States v. Sage, 92 F.3d 101, 107 (2d Cir. 1996) (concluding that the Child Support Recovery Act does not violate the Tenth Amendment because it does not "compel[ ] a State to enact and enforce a federal family program"); accord United States v. Bostic, 168 F.3d 718, 724 (4th Cir. 1999) (holding that a federal gun statute does not violate the Tenth Amendment because it was validly passed under the Commerce Clause and imposes no "affirmative obligation" on the states).

Id. at 122. The PLCAA "does not commandeer any branch of state government because it imposes no affirmative duty of any kind on any of them." See id. The PLCAA therefore does not violate the Tenth Amendment. See id.

### D. First Amendment Right of Access to the Courts

The First Amendment provides, in relevant part, that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. The right to petition, which has been recognized as "one of 'the most precious of the liberties safeguarded by the Bill of Rights,'" BE & K Const. Co. v. NLRB, 536 U.S. 516, 524 (2002) (quoting Mine Workers v. Ill. Bar Ass'n, 389 U.S. 217, 222 (1967)), "extends to all departments of the Government," including the courts, Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972) (citing Johnson v. Avery, 393 U.S. 483, 485 (1969)); see also Gagliardi v. Village of Pawling, 18 F.3d 188, 194 (2d Cir. 1994) ("The rights to complain to public officials and to seek administrative and judicial relief are protected by the First Amendment.").

By its terms, the Act bars plaintiffs from courts for the adjudication of qualified civil liability actions, allowing access for only those actions that fall within the Act's exceptions. We conclude that these restrictions do not violate plaintiffs' right of access to the courts. "The constitutional right of access [to the courts] is violated where government officials obstruct legitimate efforts to seek judicial redress." Whalen v. County of Fulton, 126 F.3d 400, 406–07 (2d Cir. 1997); cf. Barrett v. United States, 798 F.2d 565, 575 (2d Cir. 1986) ("Unconstitutional deprivation of a cause of action occurs when government officials thwart vindication of a claim by violating basic principles that enable civil claimants to assert their rights effectively."). The right to petition exists in the presence of an underlying cause of action and is not violated by a statute that provides a complete defense to a cause of action or curtails a category of causes of action. See Christopher v. Harbury, 536 U.S. 403, 415 (2002) ("[O]ur cases rest on the

22

recognition that the right [of access to the courts] is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court."); accord Garcia v. Wyeth-Ayerst Lab., 385 F.3d 961, 968 (6th Cir. 2004) ("A cognizable claim can be made out only by showing that the defendants' actions foreclosed [a potential litigant] from filing suit in state court or rendered ineffective any state court remedy [the litigant] previously may have had." (internal quotation marks omitted)).

The PLCAA immunizes a specific type of defendant from a specific type of suit. It does not impede, let alone entirely foreclose, general use of the courts by would-be plaintiffs such as the City. Cf. Tennessee v. Lane, 541 U.S. 509, 527 (2004) (upholding a statutory provision that sought to provide relief to individuals who "were being excluded from courthouses and court proceedings by reason of their disabilities"); Harbury, 536 U.S. at 413 (noting that right-of-access concerns are triggered when "official action . . . den[ies] an opportunity to litigate [to] a class of potential plaintiffs" and citing illustrative cases); NAACP v. Button, 371 U.S. 415 (1963) (striking down a state statute that had the effect of preventing "Negro litigants" from obtaining counsel); Hammond v. United States, 786 F.2d 8, 13 (1st Cir. 1986) (noting that Congressional "alter[ation] . . . [of] prior rights and remedies" does not provoke right-of-access concerns because "t]here is no fundamental right to particular state-law tort claims"). For these reasons, the PLCAA cannot be said to deprive the City of its First Amendment right of access to the courts.

IV. Does the PLCAA Require Dismissal of the City's Action?

A. Predicate Exception to Qualified Civil Liability Actions

The Firearms Suppliers maintain that the PLCAA requires immediate dismissal of this suit, which is a qualified civil liability action under the statute. The PLCAA defines "qualified

23

civil liability action" as

> a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product [i.e. a firearm that has been shipped or transported in interstate or foreign commerce],[3] or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party.

15 U.S.C. § 7903(5)(A).

The PLCAA bars the commencement or the prosecution of qualified civil liability actions by providing as follows:

> (a) In general
> A qualified civil liability action may not be brought in any Federal or State court.

> (b) Dismissal of pending actions
> A qualified civil liability action that is pending on October 26, 2005, shall be immediately dismissed by the court in which the action was brought or is currently pending.

15 U.S.C. § 7902. The Act also sets forth certain exceptions to the definition of qualified civil liability action, allowing suits to proceed that meet any of the following criteria:

> (iii) an action in which a manufacturer or seller of a qualified product [i.e., a firearm that has been shipped or transported through interstate or foreign commerce] knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought, including —

> > (I) any case in which the manufacturer or seller knowingly made any false entry

---

[3] The Act defines a "Qualified product" as

a firearm (as defined in subparagraph (A) or (B) of section 921(a)(3) of Title 18), including any antique firearm (as defined in section 921(a)(16) of such title), or ammunition (as defined in section 921(a)(17)(A) of such title), or a component part of a firearm or ammunition, that has been shipped or transported in interstate or foreign commerce.

15 U.S.C. § 7903(4).

24

in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the qualified product, or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the lawfulness of the sale or other disposition of a qualified product; or

(II) any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of Title 18;

15 U.S.C. § 7903(5)(A)(iii) (emphasis added).

The City has predicated its claims in this case on the Firearms Suppliers' alleged

violation of New York Penal Law § 240.45, Criminal Nuisance in the Second Degree, which

provides:

A person is guilty of criminal nuisance in the second degree when:

1. By conduct either unlawful in itself or unreasonable under all the circumstances, he knowingly or recklessly creates or maintains a condition which endangers the safety or health of a considerable number of persons; or

2. He knowingly conducts or maintains any premises, place or resort where persons gather for purposes of engaging in unlawful conduct.

The City claims that its suit falls within the exception set forth in section 7903(5)(A)(iii) because

New York Penal Law § 240.45 is a statute "applicable to the sale or marketing of [firearms]."

The Firearms Suppliers disagree, arguing that the predicate exception was intended to include

statutes that specifically and expressly regulate the firearms industry. The District Court agreed

with the City, finding that, "[b]y its plain meaning, New York [Penal Law §] 240.45 satisfies the

language of the predicate exception requiring a 'statute applicable to the sale or marketing of [a

firearm].'" Beretta, 401 F. Supp. 2d at 261. It is not disputed that New York Penal Law §

240.45 is a statute of general applicability that has never been applied to firearms suppliers for

conduct like that complained of by the City.

B.  Is New York Penal Law § 240.45 "Applicable" to the Sale of Firearms?

Central to the issue under examination is what Congress meant by the phrase "applicable to the sale or marketing of [firearms]."  The core of the question is what Congress meant by the term "applicable."

We conclude, for the reasons set forth in subsection "1" below, that the meaning of the term "applicable" must be determined in the context of the statute.  We find nothing in the statute that requires any express language regarding firearms to be included in a statute in order for that statute to fall within the predicate exception.  We decline to foreclose the possibility that, under certain circumstances, state courts may apply a statute of general applicability to the type of conduct that the City complains of, in which case such a statute might qualify as a predicate statute.  Accordingly, while the mere absence in New York Penal Law § 240.45 of any express reference to firearms does not, in and of itself, preclude that statute's eligibility to serve as a predicate statute under the PLCAA, New York Penal Law § 240.45 is a statute of general applicability that does not encompass the conduct of firearms manufacturers of which the City complains.  It therefore does not fall within the predicate exception to the claim restricting provisions of the PLCAA.

1.  "Applicable" In Context

The City relies on the dictionary definition of "applicable," which is, simply, "capable of being applied."  On the other hand, the Firearms Suppliers contend that the phrase "statute applicable to the sale or marketing of [a firearm]" in the context of the language in the entire statute limits the predicate exception to statutes specifically and expressly regulating the manner in which a firearm is sold or marketed — statutes specifying when, where, how, and to whom a

26

firearm may be sold or marketed. We agree that the examples of state and federal statutory violations in the predicate exception itself refer to state and federal laws that specifically and expressly govern firearms. See 15 U.S.C. § 7903(5)(A)(iii)(I)–(II). We also agree with the District Court's rejection of the Firearms Suppliers' argument that the predicate exception is necessarily limited to statutes that expressly regulate the firearms industry. However, for the reasons set forth below, we disagree with the District Court's adoption of the out-of-context "plain meaning" of the term "applicable" and its conclusion that the dictionary definition of the term "applicable" accurately reflects the intent of Congress.

The meaning of the term "applicable" must be determined here by reading that term in the context of the surrounding language and of the statute as a whole. See Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."); see also Bailey v. United States, 516 U.S. 137, 145 (1995) ("We consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme."); King v. St. Vincent Hosp., 502 U.S. 215, 221 (1991) (holding that "a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context" (citation omitted)). Adhering to this principle, we have held that "fundamental to any task of interpretation is the principle that text must yield to context." Time Warner Cable, Inc. v. DIRECT, Inc., 497 F.3d 144, 157 (2d Cir. 2007).[4]

---

[4] Our dissenting colleague contends that "the construction of the statute the majority selects leads to the sort of practical problems and absurd results we usually try to avoid," Dissent at ___. Respectfully, we disagree. We do not hold today that New York Penal Law § 240.45 may in the future be found applicable to the sale or marketing of firearms. We merely leave open the possibility that at some time in the future the New York courts may decide that another statute of general applicability encompasses the type of conduct that the City complains of. Our

Viewed in this light, the term "applicable" must be examined in context. The PLCAA provides that predicate statutes are those that are "applicable to the sale or marketing of [firearms]." 15 U.S.C. § 7903(5)(A)(iii). The universe of predicate statutes is further defined as "including" the examples set forth in subsections (I) and (II). As stated, we agree with the Firearms Suppliers that these examples refer to statutes that specifically regulate the firearms industry. Yet, as also stated, we do not agree that the PLCAA requires that a predicate statute expressly refer to the firearms industry. Thus the contours of the universe of predicate statutes — i.e., those statutes that are "applicable" to sale or marketing of firearms — are undefined and we can only conclude that the term "applicable" requires a contextual definition.

Moreover, because both the City and the Firearms Suppliers "rely on a reasonable meaning" of the term "applicable," we must look "to the canons of statutory interpretation to help resolve the ambiguity." United States v. Dauray, 215 F.3d 257, 262 (2d Cir. 2000); see also Daniel v. Bd. of Emergency Med., 428 F.3d 408, 423 (2d Cir. 2005) (explaining that where ambiguity is found in the meaning of a statute, we resort "first to canons of statutory construction and . . . [then] to legislative history").

2.      Canons of Statutory Construction

We have previously observed that "[t]he meaning of one term may be determined by reference to the terms it is associated with, and [that] where specific words follow a general word, the specific words restrict application of the general term to things that are similar to those enumerated." Gen. Elec. Co. v. Occupational Safety and Health Review Comm'n, 583 F.2d 61,

approach does nothing more than recognize that the law of New York state "is not only the language the legislature adopts, but what the courts construe to be its meaning in individual cases," Beretta, 401 F. Supp. 2d at 266; see also Section III.C, supra.

28

65 (2d Cir. 1978). We have also determined that "[w]here . . . examination of [a] statute as a whole demonstrates that a party's interpretation would lead to 'absurd or futile results . . . plainly at variance with the policy of the legislation as a whole,' that interpretation should be rejected." Yerdon v. Henry, 91 F.3d 370, 376 (2d Cir. 1996) (quoting EEOC v. Commercial Office Prods. Co., 486 U.S. 107, 120 (1988) (ellipsis in original)). Defendants contend that their view of the relevant exception "is bolstered by [both of these] settled principles of statutory interpretation." **[**

**_____a.** Other associated terms

As we noted in United States v. Dauray, 215 F.3d 257 (2d Cir. 2000), "the meaning of doubtful terms or phrases may be determined by reference to their relationship with other associated words or phrases (noscitur a sociis)." Id. at 262. In addition, "where general words" are accompanied by "a specific enumeration of persons or things, the general words should be limited to persons or things similar to those specifically enumerated (ejusdem generis )." Id. (internal quotation marks omitted).

Section 7903(5)(A)(iii) states that the exception set out therein "includ[es]":

(I) any case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the [firearm], or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the lawfulness of the sale or other disposition of a [firearm]; or

(II) any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a [firearm], knowing, or having reasonable cause to believe, that the actual buyer of the [firearm] was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of Title 18;

The general language contained in section 7903(5)(A)(iii) (providing that predicate statutes are those "applicable to" the sale or marketing of firearms) is followed by the more

29

specific language referring to statutes imposing record-keeping requirements on the firearms industry, 15 U.S.C. § 7903(5)(A)(iii)(I), and statutes prohibiting firearms suppliers from conspiring with or aiding and abetting others in selling firearms directly to prohibited purchasers, U.S.C. § 7903(5)(A)(iii)(II).  Statutes applicable to the sale and marketing of firearms are said to include statutes regulating record-keeping and those prohibiting participation in direct illegal sales.  Thus, the general term — "applicable to" — is to be "construed to embrace only objects similar to those enumerated by" sections 7903(5)(A)(iii)(I) and (II).  See Keffeler, 537 U.S. at 384.  We accordingly conclude that construing the term "applicable to" to mean statutes that clearly can be said to regulate the firearms industry more accurately reflects the intent of Congress.  Cf. Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307 (1961) ("The maxim noscitur a sociis . . . is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress").

b.  Avoiding Absurdity

The declared purposes of the statute include:

> To prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations, for the harm solely caused by the criminal or unlawful misuse of firearms products or ammunition products by others when the product functioned as designed and intended.

15 U.S.C. § 7901(b)(1).  In drafting the PLCAA, Congress found:

> Businesses in the United States that are engaged in interstate and foreign commerce through the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products that have been shipped or transported in interstate or foreign commerce are not, and should not, be liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended.

15 U.S.C. § 7901(a)(5).  We think Congress clearly intended to protect from vicarious liability members of the firearms industry who engage in the "lawful design, manufacture, marketing,

30

distribution, importation, or sale" of firearms. Preceding subsection (a)(5), Congress stated that it had found that "[t]he manufacture, importation, possession, sale, and use of firearms and ammunition in the United States are heavily regulated by Federal, State, and local laws. Such Federal laws include the Gun Control Act of 1968, the National Firearms Act, and the Arms Export Control Act." 15 U.S.C. § 7901(a)(4). We think the juxtaposition of these two subsections demonstrates that Congress meant that "lawful design, manufacture, marketing, distribution, importation, or sale" of firearms means such activities having been done in compliance with statutes like those described in subsection (a)(4).

This conclusion is supported by the "interpretive principle that statutory exceptions are to be construed 'narrowly in order to preserve the primary operation of the [general rule].'" Nussell v. Willette, 224 F.3d 95, 99 (2d Cir. 2000) (quoting Commissioner v. Clark, 489 U.S. 726, 739 (1989)), overruled on other grounds by Porter v. Nussle, 534 U.S. 516 (2002). In the "broader context of the statute as a whole," Robinson, 519 U.S. at 341, resort to the dictionary definition of "applicable" — i.e. capable of being applied — leads to a far too-broad reading of the predicate exception. Such a result would allow the predicate exception to swallow the statute, which was intended to shield the firearms industry from vicarious liability for harm caused by firearms that were lawfully distributed into primary markets.

### 3. Legislative History

We are mindful that "[c]ontemporaneous remarks of a sponsor of legislation are by no means controlling in the analysis of legislative history." Berger v. Heckler, 771 F.2d 1556, 1574 (2d Cir. 1985). Nevertheless, we find that the legislative history of the statute supports the Firearms Suppliers' proffered interpretation of the term "applicable." United States Senator Larry E. Craig, a sponsor of the PLCAA, named the case at bar as an "example[] . . . of exactly

31

the type of . . . lawsuit[] this bill will eliminate." See 151 Cong. Rec. S9374-01, 9394 (2005) (statement of Sen. Craig). United States Representative Clifford B. Stearns, the sponsor of H.R. 800, the House version of the PLCAA, inserted similar comments into the PLCAA's legislative history so that the "Congressional Record [would] clearly reflect some specific examples of the type of . . . lawsuit[]" the PLCAA would preclude. 151 Cong. Rec. E2162-03 (2005) (statement of Rep. Stearns).

Indeed, the Central District of California found in a strikingly similar case, Ileto v. Glock, 421 F. Supp. 2d 1274 (C.D. Cal. 2006), that comments by the bill's proponents consistently referred to firearms-specific statutes when discussing the scope of the predicate exception. For example, Senator Craig stated:

> Let me again say, as I said, if in any way they violate State or Federal law or alter or fail to keep records that are appropriate as it relates to their inventories, they are in violation of law. This bill does not shield them, as some would argue. Quite the contrary. If they have violated existing law, they violated the law, and I am referring to the Federal firearms laws that govern a licensed firearm dealer and that govern our manufacturers today.

Id. at 1292 (quoting 151 Cong. Rec. S9087-01 (statement of Sen. Craig)) (alterations omitted). United States Senator Jefferson B. Sessions stated: "This bill allows lawsuits for violation of contract, for negligence, in not following the rules and regulations and for violating any law or regulation that is part of the complex rules that control sellers and manufacturers of firearms." 151 Cong. Rec. S9374-01, S9378 (daily ed. July 29, 2005).

The Ileto court also noted the defeat of attempts to expand the predicate exception to include laws of general applicability. For example, when United States Senator Carl M. Levin sought to include cases in which a firearms supplier's gross negligence or recklessness is a proximate cause of injury or death, Ileto, 421 F. Supp. 2d at 1294 (citing 151 Cong. Rec. S9087-

32

01 (statement of Sen. Levin)), the bill's proponents "attacked this amendment, primarily because they believed that it would effectively 'gut' the Act." Ileto, 421 F. Supp. 2d at 1294 (citing, e.g., 151 Cong. Rec. S9374-01 (statement of U.S. Sen. John R. Thune)).  Recognizing the limited weight owed to such statements, we think that the statements nevertheless support the view that the predicate exception was meant to apply only to statutes that actually regulate the firearms industry, in light of the statements' consistency amongst each other and with the general language of the statute itself.  Cf. Murphy v. Empire of Am., FSA, 746 F.2d 931, 935 (2d Cir. 1984) (explaining that "isolated remarks, particularly when unclear or conflicting, are entitled to little or no weight").  In sum, we hold that the exception created by 15 U.S.C. § 7903(5)(A)(iii): (1) does not encompass New York Penal Law § 240.45; (2) does encompass statutes (a) that expressly regulate firearms, or (b) that courts have applied to the sale and marketing of firearms; and (3) does encompass statutes that do not expressly regulate firearms but that clearly can be said to implicate the purchase and sale of firearms.[5]

## CONCLUSION

For the foregoing reasons, the judgment of the District Court denying the Firearms Suppliers' motion to dismiss based on the claim restricting provisions of the PLCAA is REVERSED.  The judgment of the District Court with respect to the constitutionality of the PLCAA is AFFIRMED.  The case is remanded to the District Court with instructions to enter judgment dismissing the case as barred by the PLCAA.

---

[5] We confess ourselves puzzled as to how our dissenting colleague can find this brief and straightforward holding insufficient to provide "future courts . . . with[] guidance as to how to discern when a predicate statute applies."  Dissent at ___.

33

KATZMANN, *Circuit Judge*, dissenting:

Unlike the majority, I believe this case may be simply resolved by looking only at the ordinary meaning of the words in the statute. The majority's approach is problematic: first, it creates an ambiguity in the statute that does not exist; second, in confronting that supposed ambiguity, the majority breaks from our longstanding practice of avoiding difficult constitutional questions when possible; and third, it adopts a construction of the statute that leads to absurd results. Because we may easily avoid all of these problems by allowing the ordinary meaning of the statute to control and certifying the question of the applicability of New York's statute to the sale and marketing of firearms to the New York Court of Appeals, I respectfully dissent.

To begin, the meaning of the statute is unambiguous. Although a statute's plain meaning is often elusive, the Supreme Court has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254-55 (1992) (internal citations and quotation marks omitted); *Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir. 1999) ("It is axiomatic that the plain meaning of a statute controls its interpretation . . . and that judicial review must end at the statute's unambiguous terms. Legislative history and other tools of interpretation may be relied upon only if the terms of the statute are ambiguous."). When, as in this case, "a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993). As the district court correctly noted, 401 F. Supp. 2d at 261, the ordinary meaning of the word "applicable" is clear; any attempt to read that word as meaning anything more than "capable of being applied" is a strained effort to read an ambiguity that does not exist into the statute. *See Riverkeeper, Inc. v.*

34

*EPA*, 475 F.3d 83, 110 (2d Cir. 2007) (rejecting EPA's attempt to "create ambiguity when none otherwise exists by defining statutory terms contrary to their plain meaning"). The majority's attempt to limit the reach of the term "applicable" to statutes (1) expressly regulating firearms, (2) that "clearly can be said to apply," or (3) that "actually regulate" the sale and marketing of firearms would work a significant change in the meaning of the predicate exception, substituting its preferences for the words Congress actually selected. *See In re Coltex Loop Central Three Partners, L.P.*, 138 F.3d 39, 43 (2d Cir. 1998) ("If Congress had intended to modify those words with the addition of the words 'only,' 'solely,' or even 'primarily,' it would have done so. For the court to add such modifiers would work a significant and unwarranted change in the meaning and consequence of the statute.").

Because the meaning of the statutory language is clear, we ought not go further. In this case, that approach is faithful to one of the most prudent and oft-followed rules of statutory construction – that we avoid reaching constitutional questions when a fair reading of the statutory language permits us to do so. *See, e.g.*, *Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable."). As a result, if possible, courts must interpret statutes to avert constitutional questions, rather than to embrace them, as the majority does here. *See Crowell v. Benson*, 285 U.S. 22, 62 (1932) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."); *Able v. United States*, 88 F.3d 1280, 1298 (2d Cir. 1996) ("[B]ecause this is a challenge to the constitutionality of the Act, we are required to construe it 'so as to avoid constitutional difficulties whenever possible."). The majority takes

pains to find the language of the statute ambiguous – that is, susceptible of more than one reading – but, instead of opting for the most natural meaning of the statutory text, the majority adopts a construction requiring it to address head-on constitutional dilemmas that go to the heart of principles of federalism, separation of powers, and the First Amendment. Congress's requirement that state and federal courts immediately dismiss pending lawsuits presents novel and complex issues regarding the allocation of authority between the federal government and the states, and the courts and the legislature. Whether the majority is correct in its constitutional analysis is beside the point. Its choice to confront such difficult questions risks setting potentially far-reaching precedents needlessly, ignoring our eminently sensible practice of constitutional avoidance.

To justify its approach, the majority cites legislative history. I have long been an advocate of examining authoritative legislative history when a statute is ambiguous, *see, e.g.*, *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 143-44 (2d Cir. 2002), but here the statute is unambiguous. In any event, when Congress legislates in "traditionally sensitive areas," if it intends to alter the state-federal balance or the allocation of power between the branches of government, Congress should state clearly that intent in the text of the statute, not merely through statements on the floor by legislators. *See United States v. Bass*, 404 U.S. 336, 349 (1971). In the matter at hand, where the more natural reading of the statute allows us to avoid such difficult constitutional questions, we need not proceed beyond the plain meaning to complicated legislative history, especially when to do so would require us to confront those hard issues.

The majority holds, without any specific explanation, that New York's § 240.45 does not apply to the conduct the City cites in its complaint. Despite its repeated assertions that a statute

need not expressly regulate firearms to be "applicable" to firearms,[1] the majority comes to the conclusion that § 240.45 is not a statute that "clearly can be said to regulate the firearms industry" (31:7), or "actually regulate[s] the firearm industry." (34:5-6)   In the wake of the majority's unclear language and rationale surrounding its holding, future courts are left without guidance as to how to discern when a predicate statute applies.   Beyond this lack of clarity, in unnecessarily finding ambiguity in the statute, the construction of the statute the majority selects leads to the sort of practical problems and absurd results we usually try to avoid.  *Clinton v. City of New York*, 524 U.S. 417, 429 (1998); *United States v. Dauray*, 215 F.3d 257, 264 (2d Cir. 2000).   The majority's construction, particularly with respect to its statement that the predicate exception covers statutes that "actually" regulate firearms, really boils down to an empirical question: has a state court yet applied a statute of general applicability to the sale and marketing of firearms?   Under the majority's approach, the apparently insurmountable obstacle for the plaintiffs here is that the New York courts have not yet addressed the question – as such, the majority feels free to conclude that § 240.45 is not "applicable" to the sale and marketing of firearms.   Unlike, say, a fruit, which is edible long before someone has eaten it, or gasoline, which is flammable even before someone has ignited it, the majority finds that a state law is not applicable until a state court actually applies it.  *See, e.g.*, *Berhe v. Gonzales*, 464 F.3d 74, 84 (1st Cir. 2006) ("It is clear we read 'applicable' to mean, not the law *actually applied*, but, consistent with the ordinary meaning of the word, the law '*capable of being applied*.'") (quoting Merriam-Webster's Collegiate Dictionary 56 (10th ed. 2001) (emphasis in original)).

---

[1] "We find nothing in the statute that requires any express language regarding firearms to be included in a statute in order for that statute to fall within the predicate exception." **(26:15-16)**  "We also agree with the District Court's rejection of the Firearms Suppliers' argument that the predicate exception is necessarily limited to statutes that expressly regulate the firearms industry." **(27:15-16)** "Yet, as also stated, we do not agree that the PLCAA requires that a predicate statute expressly refer to the firearms industry." **(28:18-19)**

Even more fundamentally, what the majority's approach ignores is that it treats parties differently based on whether or not they may invoke the jurisdiction of the federal courts. Consider the problem of a plaintiff who brings a claim in state court under a state statute of general applicability which has not yet been applied to the sale and marketing of firearms. Under the majority's construction, plaintiffs who bring such cases against defendants who may not remove to federal court have the opportunity to ask the state court to determine whether the predicate exception might apply. But plaintiffs who bring such cases against defendants who *may remove* will be deprived of that opportunity because the majority holds that federal courts must dismiss those cases immediately, as the state statutes invoked do not *yet* meet the majority's test that they "actually"regulate the sale and marketing of firearms. Not only does this approach treat identically situated parties differently with no apparent rational basis, it invites forum shopping, *see Erie R.R. v. Tompkins*, 304 U.S. 64, 74-77 (1938); *Vitanza v. Upjohn Co.*, 214 F.3d 73, 78-79 (2d Cir. 2000). Indeed, under the majority's construction, federal law may mean one thing in federal courts, and something else entirely in state courts, a result the Supreme Court found intolerable nearly two hundred years ago in *Martin v. Hunter's Lessee*, 14 U.S. 304, 347-48 (1816).[2] Plaintiffs similar to those in this case, who may find themselves in federal court under diversity jurisdiction, face an intractable problem – their claims might fall under the predicate exception if a state court says so, but if they ask a state court, the defendants will

---

[2] Another dilemma posed by the majority's construction involves how a state court should act when placed in a situation where a federal court has already ruled on the applicability of a state statute to the sale and marketing of firearms. For instance, suppose a federal court has already held that a claim brought under a state statute of general applicability does not fall within the predicate exception because that state's courts have not yet spoken to the issue. Later, a plaintiff brings an identical claim under the identical state statute in state court, and the defendant invokes the PLCAA as an affirmative defense. The state court, bound to follow the statute, must decide whether to dismiss the case or assert that its new interpretation of state law provides the plaintiff refuge under the predicate exception. It is precisely this kind of delicate problem of federalism that the majority's approach invites.

remove to a federal court, which must dismiss the claim because the state court has not yet spoken. "That's some catch, that Catch-22." Joseph Heller, *Catch-22* at 52 (1961).

In sum, we need not confront these problems if we adhere to the plain meaning of the statute. Since the ordinary meaning of the words of the statute is clear, I would then turn to whether the New York criminal-nuisance statute, New York Penal Law § 240.45, is in fact "applicable to the sale and marketing of firearms." Whether that state statute serves as a predicate statute is a matter of federal law for this Court to address. But the threshold question of what conduct the state statute encompasses is a question of state law. In keeping with our preference that states define the meaning of their own laws in the first instance, *Allstate Ins. Co. v. Serio*, 261 F.3d 143, 150 (2d Cir. 2001) (citing *Arizonans for Official English v. Arizona*, 520 U.S. 43, 76 (1997)), and because the outcome of this case turns on the answer to this important question of state law, I would certify the question of the scope of New York Penal Law § 240.45 to the highest court of the State of New York, the New York Court of Appeals. Even assuming *arguendo*, as the majority apparently believes, that a state law does not apply until a state court applies it, then there is all the more reason for a federal court to avail itself of established procedures which enable it to seek the views of the state's highest courts as to the meaning of important questions of state law. After all, "[a]ny of our determinations of state law based upon prediction, rather than authoritative construction by the State's highest court, carries risk, especially if we turn a party out of court on a theory later repudiated by the State." *Nicholson v. Scoppetta*, 344 F.3d 154, 170 (2d Cir. 2003). In certifying, we would be recognizing that we should look to the New York Court of Appeals to interpret state laws for which no controlling precedent of that court exists. On many occasions, we have greatly benefitted from certifying significant state-law questions to the New York Court of Appeals. *See, e.g.*, *O'Mara v. Town of Wappinger,* 485 F.3d 693, 699 (2d Cir. 2007); *King v. Fox*, 458 F.3d 39, 40 (2d Cir. 2006) (per

curiam); *Carney v. Philippone*, 368 F.3d 164, 166 (2d Cir. 2004) (per curiam). *See generally* Judith S. Kaye & Kenneth I. Weissman, *Interactive Judicial Federalism: Certified Questions in New York*, 69 Fordham L. Rev. 373 (2000). If the New York Court of Appeals were to determine that New York's criminal-nuisance statute is, in fact, "applicable to the sale and marketing of firearms," and if the plaintiffs can prove that the defendants' violation of that statute was *knowing*, as is now required under the PLCAA, *see* 15 U.S.C. § 7903(5)(A)(iii), then the predicate exception would apply. Alternatively, the New York Court of Appeals could determine that the state statute is not applicable to the sale and marketing of firearms, in which case this Court would not have to address the thorny constitutional questions the majority elects to resolve now. The matter before us is thus a textbook example of when certification is appropriate. *See, e.g.*, *Nicholson*, 344 F.3d at 169-171; *Serio*, 261 F.3d at 150-53, 155; *cf. Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 500-01 (1941).

For the reasons stated above, I respectfully dissent.